UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------- x
PHILIP SELDON,

                        Plaintiff,    :       **REPORT & RECOMMENDATION**

                               :

     -against-                 **11 Civ. 6218 (PAC)(MHD)**

                               :

EDWARD MAGEDSON a/k/a ED MAGEDSON,
RIPOFFREPORT.COM, and XCENTRIC    :
VENTURES L.L.C.,

                               :

                Defendants.
---------------------------------x
**TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:**

      Plaintiff Philip Seldon, a citizen of New York, filed this
diversity action pro se on September 6, 2011, asserting common-law
claims for defamation and breach of contract. On November 7, 2011,
plaintiff filed an amended complaint as a matter of course in
response to defendants' first motion to dismiss, asserting claims
substantially similar to those alleged in the original complaint.
He alleges that defendants Edward Magedson ("Magedson") and
Xcentric Ventures, LLC ("Xcentric") knowingly posted false and
defamatory comments on their website, which is titled
ripoffreport.com. Seldon further alleges that Magedson failed to
perform certain reputation-repair services for which he and
Magedson had contracted. He seeks compensatory and punitive damages
as well as specific performance of the alleged contract.

1

Defendants move to dismiss this action for lack of personal jurisdiction. They also assert that plaintiff's defamation claims and part of his contract claim are barred by the Communications Decency Act (the "CDA"), 47 U.S.C. § 230 et seq., and that plaintiff's remaining contract claim is either barred by the Statute of Frauds or cannot be heard for lack of subject-matter jurisdiction. For the reasons set forth below, we recommend that defendants' motion to dismiss be granted based on the lack of personal jurisdiction over defendants. If the district court finds that the exercise of jurisdiction over defendants is proper, we recommend that the court grant defendants' motion to dismiss plaintiff's defamation claims and part of his contract claim as barred by the CDA, but deny their motion with respect to the remaining contract claim.

<u>BACKGROUND</u>

Defendant Xcentric, an Arizona limited liability company, owns a website known as ripoffreport.com.[1] (Am. Compl. ¶ 4). Defendant

---

[1] The domicile of an LLC is based solely on the citizenship of its members. <u>Quantlab Fin., LLC, Quantlab Techs. Ltd. (BVI) v. Tower Research Capital, LLC</u>, 715 F. Supp.2d 542, 546 (S.D.N.Y. 2010) (quoting, <u>inter alia</u>, <u>Handelsman v. Bedford Vill. Assocs. Ltd. P'ship</u>, 213 F.3d 48, 51-52 (2d Cir. 2000)). Neither party provides the citizenship of Xcentric's members. Plaintiff

Magedson, also a citizen of Arizona, is the manager of Xcentric and runs the website's day-to-day operations. (Decl. of Edward Magedson in Supp. of Defs.' Mot. to Dismiss ("Magedson Decl.") ¶ 2; Pl.'s Affirmation in Opp'n to Motion to Dismiss Am. Compl. ("Pl.'s Affirmation") ¶ 8). The website functions as a free message board where consumers can post comments regarding companies' business practices. (See Magedson Decl. ¶¶ 4-5).

According to the complaint, Seldon found himself the subject of unflattering posts by several users of the site -- Irina Borisenko and one or more patrons who identified themselves only as "Mike," "Doctor," and "Employee." (Am. Compl. ¶¶ 8, 11, 18, 25, 32, 39, 46). The posts accused plaintiff of various misdeeds ranging from sexual harassment to fraud and tax evasion. (E.g., id. ¶¶ 32, 39).[2] Seldon alleges that he spoke with Magedson, who agreed

---

describes the LLC as "located in the State of Arizona." (Am. Compl. ¶ 5). Magedson confirms that Xcentric is organized under the laws of Arizona and does business there. (Magedson Decl. ¶¶ 8-9). However, neither party disputes that defendants are solely Arizona citizens for diversity-jurisdiction purposes. Thus, we assume that that is the case for purposes of the present motion.

[2] The text of the posts, copied in the order in which plaintiff presents them:

1. An April 25, 2011 post by "Irina" titled "Sexual Pervert:"
    "Philip Seldon took nasty photos of me when he got me drunk as his roommate and then told me he deleted the photos. I found

out that he didn't delete them and had multiple copies that he
kept on his business computer and personal computer. He had
multiple photos of me printed out in file cabinets. I asked him
why he didn't delete the photos and he said he forgot but now
wishes to distribute them to people and sell them back to me.
This man has all kinds of perverted photos on his computer and is
a menace to women. He tells lies and is obsessed with stalking
me. I've issued a warning to him to stay away from me but he
continues to harass my family and friends. Nobody took any money
from me and all that he says is lies. He tries to control my
money and family but I tell him to leave me alone. He won't
listen and I am afraid of him. I will notify the police that he
is still bothering me." (Am. Compl. ¶ 18). Note that this post
underlies plaintiff's first and second defamation claims. (See
id. ¶¶ 11, 18).

2. An April 25, 2011 post by "Mike:"
      "Seldon has many judgements [sic] against him and is
currently using corporate shell companies to avoid a judgement
[sic] against him already approved by the courts. Check New
Jersey and NYC court records. If you have information regarding
this person, please contact Andrew Spinnel, attorney1 [sic] in
NYC so justice can be served." (Id. ¶ 25).

3. An April 25, 2011 post by "Doctor," titled "Tax Free Money
Income:"
      "Philip Seldon hosts wine tasting parties (200-500 people)
and takes in cash and never reports it as income to the Federal
Government. Philip Seldon gets Federal Express packages and
express mail or UPS packages with aproximaely [sic] $11,000 per
month cash contents at his home and business address (same
building apartment #2724 and #3414) from a woman named Kathy
whose [sic] one of his other companies is located in Oklahoma
where Kathy hides his money under a corporate veil (hence his
name Norman Oklahoma). Monthly wine tastings are held in NYC
under another one of his company names and he is avoiding NYC
City taxes as well. Go visit one of his wine tastings all of you
prosecutors, it's usually held at the Bulgarian National Hall on
the Upper East [S]ide so a sting operation would be good for your
public relations. His old ro[om]mate Leslie has a paypal account
that she launders the money for Philip monthly from events and
Kathy so he can avoid creditors and not pay Federal, State, and
City taxes. Philip Seldon has a stock trading account that he
trades approximately $400,000 worth of stock registered under the

4

to contact the authors of the posts in order to substantiate their

claims. (Id. ¶ 8). Magedson allegedly agreed, among other things,

---

corporate veil of Kathy's company in Oklahoma and he is the only
person trading this stock and asset. He only buys and sells Apple
Corporation stock so it won't be hard to catch him on the
corporate veil corruption he so readily sets up. Philip takes
naked pictures of his ex-ro[om]mates (always women) and tries to
hold them over their head[s] for favors and promises of future
friendship. Philip[']s motive is to usually get women drunk at
lavish wine tastings and home/office dinners and then to get
women to take of[f] their clothes and and [sic] then he takes
pictures for his files. Philip Seldon has many nude photos of
himself on his computer that he shows to women. They are
pornography of an old man with his clothes off exposing his
penis. The courts would love to see these photos since he is
always in court filing harassment lawsuits against people to
obtain money to supplement his income." (Id. ¶ 32).

4. An April 25, 2011 post by "Employee," titled "Philip Seldon
Vindictive Harassment:"
        "Philip Seldon is harassing this man since his ex-roommate
won't go out with him, have sex with him, or take more alcohol
induced photos by himself with her clothes off. This man is
unstable and women should be cautious around him. He will use
your iden[t]ity for 'Pay Pal' fraud schemes as he's done with
many women in the past. Caution with your SSN, credit casrds
[sic], and never sign anything for him since his past roommates
have been abused with his fraud schemes. Contact Andrew Spinnell,
attorney in NYC if you need assistance reporting his fraud
schemes. Mr. Spinnell has won many cases against Seldon and knows
of his schemes and tricks utilized for money laundering, tax
evasion[,] and cash business[] operations." (Id. ¶ 39).

5.  An April 25, 2011 post by "Employee" titled "Philip Seldon:"
        "Philip Seldon is harassing his ex-room[m]ate in vindictive
manners. He gets women drunk and takes photos of them and then
uses them for personal perverted manners. He has been asked to
delete the photos but keeps multiple sets on his computer. Philip
Seldon has been asked to stay away from his ex-room[m]ate and
friends and family but he continues to harass people. Philip is
incapable of falling in love due to the evil hate inside of him."
(Id. ¶ 46).

to remove the posts if the authors were unable to establish their claims. (Id.; Pl.'s Affirmation ¶ 8).[3] According to Seldon, Magedson failed to follow through on his promises, prompting this lawsuit. Based on these allegations, Seldon asserts claims for defamation and for breach of contract.

Defendants move to dismiss the complaint on several grounds. They assert that this court lacks personal jurisdiction over them, that plaintiff's defamation claims and part of his contract claim are barred by the CDA, and that the remaining portion of his breach-of-contract claim is barred by the Statute of Frauds. (See

---

[3] Plaintiff's version of these events is unclear. In his complaint, Seldon refers to a single "agreement," entered into on August 24, 2011. (See Am. Compl. ¶¶ 8, 53). However, in his affirmation, he refers to two oral contracts formed via telephone, one in June 2011 and one in July 2011. (See Pl.'s Affirmation ¶ 8). Furthermore, Seldon's pleadings are inconsistent regarding what exactly defendants agreed to do regarding the offensive posts. At one point, Seldon alleges that Magedson agreed only to remove the posts if they proved groundless (see Am. Compl. ¶ 8); at a later point, he asserts that Magedson also agreed to make the posts unsearchable and to "provide advertising for various companies" with which he was associated "in exchange for websites" that he was not using. (See id. ¶ 53). In plaintiff's motion papers, he specifies that the second contract was only for advertising and not for the removal of defamatory posts. (Pl.'s Affirmation ¶ 9). Regardless of the exact details, the substance of Seldon's contract claim appears to be that the parties reached at least one agreement under which Magedson promised that if the accusations were unfounded he would ensure that the posts in question would not be searchable by the general internet-using public. The exact form of the agreement(s) is irrelevant to the pertinent jurisdictional analysis.

Mot. to Dismiss Am. Compl. ("Defs.' Mot.") 2-16, Nov. 28, 2011).[4] Furthermore, if plaintiff's defamation claims are dismissed, defendants argue, this court would lack subject-matter jurisdiction over the contract claim. (Id. at 2-3, 16-17). We first address whether we have jurisdiction over defendants, and answer that question in the negative.

ANALYSIS

I. Personal Jurisdiction

    A. The Jurisdictional Arguments

Defendants seek dismissal of both the six defamation claims and the contract claim for lack of personal jurisdiction. In support of their motion, they proffer the declaration of defendant Edward Magedson, who reports, without contradiction, that he is a resident of Arizona, that he is the "manager" of co-defendant "XCENTRIC VENTURES, L.L.C.," that Xcentric is based in Tempe,

---

[4] By order dated November 30, 2012 we deemed the defendants' second motion, addressed to the amended complaint, to be a reply in support of defendants' original motion to dismiss, dated October 25, 2011. This motion was construed as addressing both complaints. Defendants filed a further reply in support of their motion on December 20, 2012, which was permitted under our December 16, 2012 endorsed order.

Arizona, and that it operates a website located at
www.ripoffreport.com and www.badbusinessbureau.com. (See Magedson
Decl. ¶¶ 1-2). He describes the so-called "Ripoff" site as a
passive system under which users post "individual 'reports,'" such
as comments about the practices of a business, and "[o]ther
consumers or the company that is the subject of the report can then
comment on that report by posting a rebuttal." (Id. ¶ 4). He avers
that the site "is a free resource available to the public" and also
aids law enforcement and other investigations. (Id. ¶ 6).

Magedson goes on to state that Xcentric is an Arizona limited
liability company, that its sole place of business is in Arizona,
and that it has no assets, offices or employees in New York State,
nor any customers there and that it does not run any advertising
for New York businesses. (Id. ¶¶ 8-10, 12-13). As for himself, he
reports that he owns no real estate in New York. (Id. ¶ 11).

Based on this proffer, defendants argue that plaintiff cannot
satisfy the requisites for jurisdiction under either section 301 or
section 302(a)(1) of the New York Civil Practice Law and Rules
("CPLR"), since defendants have no continuous presence in New York
and the claims in this case do not arise out of any activity
undertaken by defendants in this state. (Defs.' Mot. 3-7). Focusing

on sections 302(a)(2) and (3), they further note that these provisions are inapplicable to defamation claims. (Id. at 7). Finally, they assert that section 302(a)(4) cannot apply in the absence of ownership by them of real estate in New York. (Id. at 8).

In opposing this aspect of defendants' motion, plaintiff seems to invoke principally section 302(a)(1), asserting that he made one or more oral agreements with Magedson by telephone while he -- a resident of New York -- was present in the state, though defendant was apparently in Arizona at the time. Since these alleged agreements form the basis for plaintiff's current contract claim, he asserts that jurisdiction is available over defendants. (See, e.g., Am. Compl. ¶ 53; Pl.'s Affirmation ¶ 8).[5] He also may be understood to suggest that Xcentric's website is interactive and that the company offers some commercial services, thus arguably

---

[5] Plaintiff also alludes to New York court cases in which the current defendants were also parties, and he seems to suggest that the cited decisions stand for the proposition that jurisdiction may be asserted over Xcentric. (See Pl.'s Affirmation ¶¶ 4-6). Defendants respond that one of the cited decisions made no such findings, that the other decision rejected the applicability of section 301 and that its holding that section 302(a)(1) applied to this defendant has since been rejected by another New York judge. (See Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") 1-2).

triggering general jurisdiction under section 301.

B. Standards

Once a defendant challenges a court's exercise of personal jurisdiction, plaintiff bears the burden of establishing that jurisdiction is indeed proper. See, e.g., Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999) (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)). In evaluating whether jurisdiction is proper on a Rule 12(b)(2) motion, the court is afforded a large degree of discretion as to process. See, e.g., CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986). It may choose to rely on the pleadings and affidavits proffered or to conduct a full evidentiary hearing. See id. Where, as here, no discovery has taken place and no evidentiary hearing has been held, the plaintiff need merely make a prima facie showing that jurisdiction over defendant is proper. Id.; Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997); Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 196-97 (2d Cir. 1990).[6] In undertaking a jurisdictional

---

[6] Even if such a prima facie showing is made, "[e]ventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial."

analysis, the court must construe the pleadings in the light most favorable to the plaintiff, and must resolve all doubts in his favor. DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

In diversity cases, the court must look to the law of the forum state to determine whether the exercise of in personam jurisdiction over an out-of-state defendant is proper. See, e.g., D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006) (citing Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)); Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997). If the exercise of jurisdiction is appropriate under the relevant state statute, the court then must decide whether such exercise comports with the requisites of due process. Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007) (citing Int'l Shoe Co. v. Wash., 326 U.S. 310, 315 (1945)).

Because this case is before us on diversity, we look to New York law to determine whether jurisdiction is proper. Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to CPLR

E.g., A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993); Bohn v. Bartels, 620 F. Supp.2d 418, 424 (S.D.N.Y. 2007).

301 ("section 301"), and (2) long-arm jurisdiction pursuant to CPLR 302 ("section 302").

### 1. Section 301 - General Jurisdiction Criteria

Section 301 confers jurisdiction over a foreign corporation "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence'" there. Laufer v. Ostrow, 55 N.Y.2d 305, 309-10, 449 N.Y.S.2d 456, 458 (1982) (quoting McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643 (1981)); see also Citigroup Inc. v. City Holding Co., 97 F. Supp.2d 549, 569 (S.D.N.Y. 2000).[7] A defendant's "presence" is based on the "permanence and continuity" of its commercial contacts with the forum state. Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) (quoting Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)). A court may exercise jurisdiction over such a defendant under section 301 regardless of where the cause of action arose. See id. at 59.

---

[7] Section 301 of the CPLR states that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."

The doing-business analysis is based upon the application of a "simple pragmatic" test. Bryant v. Finnish Nat'l Airline, 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 628-29 (1965). This search for "simple pragmatism" has resulted in a judicial focus on the following set of factors: (1) whether the company has an office in New York; (2) whether it solicits business in New York; (2) whether it has any bank accounts or other property in New York; (4) whether it has a phone listing in New York; and (5) whether it has individuals permanently located in New York to promote its interests. See, e.g., Hoffritz, 763 F.2d at 58; Seldon v. Direct Response Techs., Inc., 2004 WL 691222, at *4 (S.D.N.Y. Mar. 31, 2004).

A foreign corporation's "[s]olicitation of business alone will not justify a finding of [its] corporate presence in New York . . . ." Laufer, 55 N.Y.2d at 310, 449 N.Y.S.2d at 459; accord Citigroup, 97 F. Supp.2d at 569. Under the "solicitation-plus" test, the exercise of personal jurisdiction is proper only if the solicitation is both substantial and continuous, and the defendant engages in other activities of substance in the state. Citigroup, 97 F. Supp.2d at 569 (quoting Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043-44 (2d Cir. 1990)).

13

## 2. Section 302(a) - Specific Jurisdiction Criteria

By contrast, section 302(a) confers jurisdiction over a defendant when the cause of action arises out of that defendant's intentional contact with New York, no matter how minimal. N.Y. C.P.L.R. 302(a); see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012); Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs., 7 N.Y.3d 65, 71, 818 N.Y.S.2d 164, 166-67 (2006). Because section 302(a) jurisdiction is focused on where the cause of action arose, the analysis is necessarily a claim-specific one. See, e.g., Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 289 (1st Cir. 1999) (stating that "[q]uestions of specific jurisdiction are always tied to the particular claims asserted"); Smal & Partners UK Ltd. v. Podhurst Orseck P.A., 2012 WL 1108560, at *3 (D. N.J. Mar. 2, 2012) (citing cases) (specific jurisdiction is generally analyzed on a claim-by-claim basis).

Under section 302(a)(1), a court may exercise personal jurisdiction over a non-domiciliary who "transacts any business" within New York or "contracts anywhere to supply goods or services in the state," provided that the cause of action arose out of that transaction of business. Deer Consumer Prods., Inc. v. Little, 35 Misc.3d 374, 938 N.Y.S.2d 767 (Sup. Ct. N.Y. Cnty. 2012 (citing

Lebel v. Tello, 272 A.D.2d 103, 104, 707 N.Y.S.2d 426, 427 (1st Dep't 2000)).[8] "Thus, to determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York [or contracts to supply goods and services in New York] and, if so, (2) whether this cause of action 'aris[es] from' such business transaction." Id. As for the other long-arm jurisdiction provisions of the CPLR, section 302(a)(2) permits assertion of jurisdiction over an out-of-state defendant who "commits a tortious act within the state" but excludes claims for defamation. See, e.g., Knight-McConnell v. Cummins, 2005 WL 1398590, at *3 (S.D.N.Y. June 13, 2005) (citing cases).[9] Section 302(a)(3) authorizes jurisdiction over a person who "commits a tortious act without the state" if the act causes injury to a person or property in New York and the defendant either regularly does or solicits business in New York or derives substantial revenue from goods or services provided in the state or

---

[8] Section 302(a)(1) of New York's Civil Practice Law and Rules states that "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."

[9] A New York "court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act." N.Y. CPLR § 302(a)(2).

should reasonably expect the tortious act to have consequences within the state and derives substantial revenue from interstate or foreign commerce. N.Y. CPLR 302(a)(3).[10] Finally, section 302(a)(4) permits assertion of jurisdiction over a party who "owns, uses or possesses" any real property in New York.

### C. Assessment of General Jurisdiction

Plaintiff does not specify which statutory provision he seeks to rely upon as a basis for jurisdiction, although the few decisions that he invokes make clear that their focus is on the specific-jurisdiction provisions of section 302(a) rather than general jurisdiction authorized under section 301. This focus is not surprising, since the courts have made very clear that the mere availability of a website to New York residents does not constitute

---

[10] A New York "court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

a presence, much less a continuous and systematic presence, in the
state for jurisdictional purposes.

Plaintiff does not allege any facts in his complaint to
sustain section 301 jurisdiction. He also does not explicitly argue
that the court can assert general jurisdiction over defendants, and
hence he offers no explicit evidentiary proffer designed to show a
basis for invoking section 301. Given his pro se status, we broadly
read his motion papers, but still find no such ground.

As our court has noted in a prior case brought by plaintiff
Seldon, section 301 requires the court to look to such matters as
whether the defendant has an office in New York, has bank accounts
here, has a phone listing in New York, engages in public relations
here or has a representative within the state to promote its
interests. Seldon, 2004 WL 691222, at *4. Plaintiff here does not
allege any such facts or proffer any evidence to refute the
representations of the defendants to the contrary. See, e.g.,
Skrodzki v. Marcello, 810 F. Supp.2d 501, 507 (E.D.N.Y. 2010)
(finding no general jurisdiction where defendants asserted without
contradiction that they did not maintain an office in New York, did
not conduct solicitations of business targeting New York consumers,
did not maintain any bank accounts or other property in New York,

17

did not have any employees or agents in New York, and did not have an on-going contractual relationship with a New York corporation).

As for the availability of the website here and everywhere else within the United States, a defendant's maintenance of even an interactive website "generally will not confer general jurisdiction over a defendant." Id.; accord, e.g., Yanouskiy v. Eldorado Logistics Sys., Inc., 2006 WL 3050871, at *3 (E.D.N.Y. Oct. 20, 2006) (citing cases) ("[t]he mere existence of a rudimentary website cannot raise a viable issue as to whether this Court has general jurisdiction"); Citigroup, 97 F. Supp.2d at 570-71. Indeed, even if the website is interactive in the sense that a viewer may contact the operator of the site and exchange information, that fact will not permit invocation of general jurisdiction. See, e.g., Yanouskiy, 2006 WL 3050871, at *3 (citing and quoting cases). At most, a continuing presence might be established if the web operator were using the site to offer and sell products and services in the state on a continuing and substantial basis, see id. (plaintiff failed to show that "a visitor to the website may order, arrange a delivery, or conduct any actual commerce"); see also Knight-McConnell, 2005 WL 1398590, at *3 (noting that absent commercial transactions via the website, even specific jurisdiction under section 302(a)(1) may be unavailable), but again plaintiff

18

offers no evidence that the site in question engages in any commercial activity in New York, much less on a continuing and substantial basis. Plaintiff's references to scattered additional contacts with Magedson do not offer any greater support for general jurisdiction.

According to plaintiff, Magedson initiated one or more phone calls to him[11] and entered into an oral contract with him.[12] (See Pl.'s Affirmation ¶ 8). Such activity does not amount to "systematic and continuous" conduct; isolated and infrequent commercial contacts are insufficient to warrant subjecting defendants to general jurisdiction in New York. See, e.g., Barrett v. Tema Dev. (1988), Inc., 463 F. Supp.2d 423, 430-33 & 432 n.8 (S.D.N.Y. 2006) (court agreed that it would not have general jurisdiction over defendant; in addition, court found no specific jurisdiction over defendant in breach-of-contract action where defendant had a single in-person meeting with plaintiff to negotiate terms, had communicated both telephonically and

---

[11] Magedson disputes this point. Drawing all inferences in favor of plaintiff, we assume that Magedson initiated all correspondence with plaintiff. (See, e.g., Pl.'s Affirmation ¶ 8).

[12] Plaintiff does not allege that Magedson contacted the authors of the allegedly defamatory posts by phone, and there is no indication whether those authors were in New York. (See Am. Compl. ¶ 8).

19

electronically with plaintiff during negotiations, and had a New York bank account); see also Skrodzki, 810 F. Supp.2d at 507-11 (finding no general or specific jurisdiction where a contract, with an accompanying exchange of monetary consideration, was negotiated by phone and additional electronic communications; court found that the transaction was not substantial and the contract's "center of gravity" was outside of the state).

We note that plaintiff cites one decision by a New York State Supreme Court justice in Intellect Art Multimedia, Inc. v. Milewski, 2009 WL 2915273 (Sup. Ct. N.Y. Cnty. Sept. 11, 2009), in support of his argument that jurisdiction over defendants is proper, but the court there noted that "it is undisputed that Xcentric is not subject to general jurisdiction based on presence or domicile in New York under CPLR § 301 . . . ." Id. at *5.

Plaintiff also proffers a portion of a memorandum of law that was filed by the attorney for Intellect Art in that same case (the "IA Memo"), and we assume that he invites us to adopt the argument of the attorney for Intellect Art in which he invokes section 301. (Pl.'s Affirmation Ex. B, at 5-6). Although the proffered memorandum argues that Xcentric has certain business practices that should be deemed to give it a continuing business presence in New

20

York, Seldon does not provide the exhibits cited in the proffered memorandum that formed the factual premise for this argument. We may take judicial notice of events in another lawsuit, <u>see</u>, <u>e.g.</u>, <u>Lefkowitz v. Bank of N.Y.</u>, 676 F. Supp.2d 229, 249 (S.D.N.Y. 2009) (gathering cases), but we cannot take into consideration the conclusory assertions of the attorney in a memorandum of law in that other case, and in any event, as we note, the New York court -- which had the benefit of the evidentiary showing that we lack -- rejected Intellect Art's argument that section 301 jurisdiction could be invoked in the case against Xcentric.

Finally, even if we relied on what is referenced to generally in the Intellect Art submission to the state court and ignored that court's rejection of general jurisdiction, we would come to the same conclusion. The plaintiff in that case, and Seldon here by implication, suggested that ripoffreport.com's Terms of Service ("TOS") and Xcentric's Corporate Advocacy Program ("CAP") justified invoking general jurisdiction. (IA Memo 6, 8). That argument is meritless.

According to Intellect Art, the TOS is an agreement by which a member of ripoffreport.com forfeits certain authorship rights in exchange for free use of the site. (IA Memo 6, 11). Supposedly, all

21

ripoffreport.com users must agree to the TOS before they are allowed to use the site. (See id.). The CAP, Intellect Art claims, is a program through which Magedson solicits and contracts with New York businesses to provide reputation-repair services in exchange for a fee. (See id. at 6). Unlike the TOS, users are not required to enter into the CAP contract as a prerequisite for free use of the site. (Id. at 6, 9). In fact, according to the IA Memo, the CAP is an effort to make money not from the website's consumer-posting contingent, but from the subjects of negative posts. (Id. at 9-10).

Taking Seldon's implicit assertion that all "users" (which we assume to mean posters) (see IA Memo 6) must agree to the TOS as true, such an agreement would appear to satisfy the systematic and continuous quality of contacts required to invoke jurisdiction under section 301. However, the TOS is not commercial, and, therefore, Xcentric is not "doing business" in New York when it requires posters to agree to the TOS. Seldon does not allege that any purchases are made or that any money is exchanged under the TOS. (Id. at 6, 11). Thus, even if every New York user must agree to the TOS, that in and of itself would not demonstrate that Xcentric is "doing business" within the state. Cf. Rescuecom Corp. v. Hyams, 477 F. Supp.2d 522, 529-30 (N.D.N.Y. 2006) (finding no specific jurisdiction over defendant where website visitors could

22

register and receive login names and passwords, registered members
could post messages to each other in the message forum or send
private communications to each other, and registered members agreed
to be bound by terms and conditions of membership).

Unlike the TOS, Xcentric's CAP -- as described by Seldon --
comprises a potential commercial contact with New York. Under the
CAP, defendants allegedly perform internet-reputation-repair
services for a fee. (E.g., Pl.'s Affirmation ¶ 7). However,
solicitation of business through the CAP is insufficient to find
personal jurisdiction over defendants unless that solicitation is
"'substantial and continuous, and defendant[s] engage[] in other
activities of substance in the state.'" Citigroup, 97 F. Supp.2d at
569 (quoting Laufer, 55 N.Y.2d at 310, 449 N.Y.S.2d at 459; Landoil
Res. Corp., 918 F.2d at 1043-44).

Plaintiff fails to proffer any information, however, to
demonstrate that defendants' CAP solicitation in New York is
"substantial and continuous" -- or indeed has occurred at all -- or
that defendants engage in other substantive activity in New York.
Neither Seldon's complaint nor the IA Memo detail how defendants
solicit customers for enrollment in CAP, or how many New York

23

individuals and businesses, if any, are enrolled in that program.[13] It is even unclear whether Seldon claims that he himself enrolled in CAP or that he simply entered into a separate agreement with Magedson. In addition, Magedson states that Xcentric has "no customers in New York," although he does not specify whether a customer of CAP would necessarily also be a customer of Xcentric. (See Magedson Decl. ¶ 13).

In sum, neither Xcentric's TOS nor its CAP evidence the requisite systematic and continuous commercial contact with New York to confer jurisdiction under section 301. Cf. Seldon, 2004 WL 691222, at *4; Cornell v. Assicurazioni Generale, Consol., 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (no general jurisdiction over defendants who maintained a website accessible by New York citizens; plaintiffs did not contend that the website was created in New York, that the server on which the site existed and from which it was accessed was located in New York, or that defendants' use of the website was purposefully directed toward New York).

---

[13] The IA Memo alleges that Magedson and a "maligned corporation" entered into a CAP contract for $50,000.00 plus a $1,500 monthly retainer. (IA Memo 10). However, the IA Memo does not indicate whether the corporation was incorporated or based in New York. (Id.).

24

Seldon has the burden of making a _prima_ _facie_ showing of jurisdiction under section 301. As alleged, the totality of defendants' purposeful contacts with New York amount to a handful of communications resulting in at least one contract with Seldon, the existence of a non-commercial interactive website on the internet, a non-commercial contract with each New York user (the TOS), and a commercial relationship with an unknown number (if any) of New York companies and/or individuals via the CAP. Defendants do not maintain New York offices or employees and have no property or assets in New York. Given the absence of factual allegations demonstrating that defendants are "present" in New York, Seldon has not made the requisite _prima_ _facie_ showing that defendants are subject to general jurisdiction here. See UTC Fire & Sec. Ams. Corp., Inc. v. NCS Power, Inc., --- F.Supp.2d ----, 2012 WL 423349, at *4 (S.D.N.Y. Feb. 10, 2012) (finding no general jurisdiction over defendant who maintained a website, which was accessible in New York, sold products outside of New York that were used in products sold within New York, and solicited three New York-based customers, one of whom entered into a contract with defendant); see also Schmidt v. Martec Indus. Corp., 2009 WL 2883071, at *3 (E.D.N.Y. Sept. 3, 2009) (finding no general jurisdiction where plaintiff did not make _prima_ _facie_ showing that defendant did

25

business in New York); <u>Madison Models, Inc. v. Casta</u>, 2003 WL
21978628, at *4 (S.D.N.Y. Aug. 20, 2003) (same).


D. <u>Assessment of Specific Jurisdiction</u>


Even if general jurisdiction is lacking, section 302(a) allows
a court to exercise personal jurisdiction in certain circumstances
where the cause of action alleged arises out of defendants'
contacts with New York. However, for the reasons set forth below,
plaintiff fails to show that there is specific jurisdiction over
defendants pursuant to section 302(a) for either the defamation
claims or the contract claim.


1. <u>The Defamation Claims</u>

a. <u>Sections 302(a)(2), (3), and (4)</u>


As we have noted, sections 302(a)(2) and (3) explicitly
exclude defamation claims, and they therefore offer no basis to
assert jurisdiction over plaintiff's first six claims. <u>See</u>, <u>e.g.</u>,
<u>Best Van Lines</u>, 490 F.3d at 244-45. As for section 302(a)(4), it
requires that the defendant "own[], use[] or possess[] . . . real
property situated within the state." It is not disputed that

26

defendants have no real property here, thus precluding use of that provision to assert jurisdiction.

We accordingly turn to the remaining potentially applicable provision, section 302(a)(1).

### b. Section 302(a)(1)

Section 302(a)(1) confers personal jurisdiction over a defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state." This subsection "confers jurisdiction over 'a defendant who purposefully avails itself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws,' where the cause of action arises out of the subject matter of the business transacted." Citigroup, 97 F. Supp.2d at 564 (quoting Viacom Int'l, Inc. v. Melvin Simon Prods., 774 F. Supp. 858, 862 (S.D.N.Y. 1991)). Unlike under section 301, a single business transaction can suffice to confer jurisdiction under section 302(a)(1), if the claim alleged arises out of that transaction. Id. (citing Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 179 (S.D.N.Y. 1995); Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198-99 (1988)).

27

The meaning of "transacting business" under section 302(a)(1) "overlaps significantly" with the minimum-contacts due-process test; however, New York's long-arm statute encompasses a wider range of activity than the minium-contacts doctrine. Best Van Lines, 490 F.3d at 247-48 (citing McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37 (1967)). "The court must look to the totality of the circumstances to determine the existence of purposeful activity and may not subject the defendant to jurisdiction based on random, fortuitous, or attenuated contacts." K.C.P.L., Inc. v. Nash, 1998 WL 823657, at *4 (S.D.N.Y. Nov. 24, 1998) (citing CutCo, 806 F.2d at 365). Depending on their nature, a defendant's contacts with New York via the internet can provide a ground for 302(a)(1) jurisdiction. Knight-McConnell, 2005 WL 1398590, at *2 (citing Citigroup, 97 F. Supp.2d at 564-65).

In assessing the reach of the "transacting-business" concept when the conduct in question occurs over a website, we note that "many courts have turned to the standards set out more than ten years ago by a judge of the Western District of Pennsylvania in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)." Best Van Lines, Inc., 490 F.3d at 251. To this end, courts have considered a "spectrum of internet interactivity" in

evaluating whether jurisdiction is proper. Id. (discussing interactivity framework enumerated by the Zippo court). "At one end of the spectrum are 'passive' websites which display, but do not permit an exchange of, information." Seldon, 2004 WL 691222, at *3 (quoting Hsin Ten Enter. USA, Inc. v. Clark Enters., 138 F. Supp.2d 449, 456 (S.D.N.Y. 2000)). "At the other end of the spectrum are cases in which the defendant clearly does business over the Internet, such as where it repeatedly transmits computer files to customers in other states." Hsin Ten, 138 F. Supp.2d at 456. "Occupying the middle ground are 'interactive' websites, which permit the exchange of information between the defendant and website viewers," but whose commercial quality is not so overt. Id. "In this 'middle ground,' a court's jurisdictional inquiry is guided by the commercial nature of the information exchanged and the degree to which the website is interactive." In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 343 F. Supp.2d 208, 215 (S.D.N.Y. 2004); accord Yash Raj Films (USA) Inc. v. Dishant.com LLC, 2009 WL 4891764, at *5 (E.D.N.Y. Dec. 15, 2009). Interactive websites with significant commercial elements are generally found sufficient to constitute in-state transaction of business while those lacking significant commercial elements typically are not. See, e.g., Rescuecom Corp. v. Hyams, 477 F. Supp.2d 522, 529 (N.D.N.Y. 2006) (comparing, e.g., Hsin Ten, 138 F. Supp.2d at 456

29

(defendants transacted business in New York where out-of-state
website was highly interactive and enabled New York viewer to
purchase products online, download order form, and chat with online
representative) with Knight-McConnell, 2005 WL 1398590, at *3
(defendants did not transact business in New York based on online
postings of statements about New York resident on out-of-state
website)).

We note that "[w]hile analyzing a defendant's conduct under
the Zippo sliding scale of interactivity may help frame the
jurisdictional inquiry in some cases . . . it does not amount to a
separate framework for analyzing internet-based jurisdiction." Best
Van Lines, Inc., 490 F.3d at 251 (quotation marks omitted).
"Instead, traditional statutory and constitutional principles
remain the touchstone of the inquiry." Id. (quotation marks
omitted). Thus, the Second Circuit has noted that this
interactivity analysis "may be useful for analyzing personal
jurisdiction under section 302(a)(1), but only insofar as it helps
to decide whether the defendant 'transacts any business' in New
York -- that is, whether the defendant, through the website,
'purposefully avail[ed] himself of the privilege of conducting
activities within New York, thus invoking the benefits and

protections of its laws.'" Id. at 252 (alteration in original)
(quoting CutCo, 806 F.2d at 865).


        Defamation claims are treated differently from other claims
under section 302(a). Such claims "are accorded separate treatment
to reflect the state's policy of preventing disproportionate
restrictions on freedom of expression -- though, where purposeful
transactions of business have taken place in New York, it may not
be said that subjecting the defendant to this State's jurisdiction
is an unnecessary inhibition on freedom of speech or the press."
SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n, 18 N.Y.3d
400, 404, 940 N.Y.S.2d 525, 527 (2012) (citation omitted).
Therefore, New York courts construe "transacts any business within
the state" more narrowly in defamation cases than in other cases.
Id. at 405, 940 N.Y.S.2d at 529 (quoting Best Van Lines, 490 F.3d
at 248). "In other cases, proof of one transaction, or a single
act, in New York is sufficient to invoke [long-arm] jurisdiction,
even though the defendant never enters New York, [but in]
defamation cases . . . the single act of uttering a defamation, no
matter how loudly, is not a transact[ion of] business that may
provide the foundation for personal jurisdiction." Best Van Lines,
490 F.3d at 248 (internal quotations and citations omitted) (citing
cases). In the context of allegedly defamatory website postings,

31

courts applying New York law have found that the posting of
defamatory material on a website that is accessible in New York
does not alone constitute the transacting of business under section
302(a)(1). Best Van Lines, 490 F.3d 250 (citing cases). However,
"jurisdiction will lie . . . if the [defamatory] posting is
intended to target or focus on internet users in the state where
the cause of action is filed." Knight-McConnell, 2005 WL 1398590,
at *3 (internal quotation marks omitted) (quoting Best Van Lines v.
Walker, 2004 WL 964009, at *5 (S.D.N.Y. May 5, 2004); Seldon, 2004
WL 691222, at *4-5).


     Plaintiff's defamation claims are based solely on the alleged
libelous postings on defendants' website. But the fact that
allegedly defamatory posts may be viewed in New York is
insufficient to sustain a finding of jurisdiction under section
302(a). Knight-McConnell, 2005 WL 1398590, at *3 (quoting Best Van
Lines, 2004 WL 964009, at *5) (defamatory online postings about New
York-resident plaintiff insufficient to provide a basis for
jurisdiction); Seldon, 2004 WL 691222, at *4. Jurisdiction will lie
only if the posts are intended to target internet users in New
York. Id. (quoting Seldon, 2004 WL 691222, at *4-5).

Nothing in the complaint, which includes the full text of the posts at issue, suggests that the website targeted New York users as distinct from users in other states. While some of the posts mention New York, they do so in the context of describing either Seldon himself or his New York-based conduct. (E.g., Am. Compl. ¶ 32). Defendants do not reference New York in an effort to attract membership or readership from, or to solicit business from, that state; indeed, the posts were not even authored by defendants. Though some of the posts suggest that readers should contact a New York City attorney concerning Seldon's purported misdeeds, those references originate from users unaffiliated with defendants, and also do not serve as audience-targeting mechanisms. (See, e.g., id. ¶¶ 25, 39). Additionally, none of the titles or headings of the posts, which are presumably intended to attract readership and are allegedly authored by defendants (Am. Compl. ¶ 9), mention New York. (E.g., id. ¶¶ 18, 32, 39 (headings include "Sexual Pervert," "Tax Free Money Income," and "Philip Seldon Vindictive Harassment")). Finally, all of the postings are equally viewable by users nationwide (and presumably internationally). This analysis points to the absence of evidence that defendants' website activity -- which is the only conduct that gives rise to plaintiff's defamation claims -- amounts to the transaction of business in New

33

York. The characteristics of the website -- referred to by plaintiff as interactive -- do not alter this conclusion.

Defendants' website, ripoffreport.com, is a low-level "interactive" website that falls into the middle ground of the Zippo interactivity spectrum. The website involves more than the passive posting of information -- its members can post reviews of businesses, which defendants routinely review and for which they provide the headings. Moreover, posters and the targets of the postings can communicate with the website operators. See The Katiroll Co., Inc. v. Kati Roll & Platters, Inc., 2010 WL 2911621, at *4 (S.D.N.Y. July 9, 2010) (citing Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2008 WL 1700196, at *5 (S.D.N.Y. Apr. 4, 2008)) ("A website that allows users to post on a message board, but from which no goods can be ordered or purchased falls in th[e] "middle ground."); see also Rescuecom, 477 F. Supp.2d at 529-30; Seldon, 2004 WL 691222, at *4-5. However, the website has not been shown to be commercial in nature, as there are no allegations that users can engage in any commercial transactions through the website. See Capitol Records, LLC v. VideoEgg, Inc., 611 F. Supp.2d 349, 358 (S.D.N.Y. 2009) (a website does not conduct traditional business over the internet where it neither sells goods or services

34

through the website nor charges membership fees); <u>see</u> <u>also</u>
<u>Citigroup</u>, 97 F. Supp.2d at 566 n.8.


Merely hosting an interactive, non-commercial website with a
nationwide audience, which website is not alleged to raise
significant revenues from New York consumers, does not amount to
defendants purposefully availing themselves of the privilege of
doing business in New York under section 302(a)(1). <u>See</u> <u>Capitol</u>
<u>Records, LLC</u>, 611 F. Supp.2d at 358-60; <u>Seldon</u>, 2004 WL 691222, at
*4-5 (no jurisdiction over defendants under section 302(a)(1) for
defamation claims where defendants occasionally solicited business
in New York, negotiated a contract from out of state, via
telephone, with plaintiff, who was located in New York, mailed a
proposed contract from out of state to plaintiff in New York, and
maintained a website that contained interactive message boards);
<u>Sino Clean Energy Inc. v. Little</u>, 2012 WL 1849658, at *7 (Sup. Ct.
N.Y. Cnty. May 21, 2012) ("internet activities of maintaining a
website with discussion threads and email subscription offering,
posting responses and comments to the website users, who could
download reports and files directly to their computers, are
insufficient to support a necessary finding that [defendant]
purposefully and knowingly interacted with New York residents or
otherwise targeted New York for business"); <u>cf.</u> <u>M. Shanken</u>

35

Commc'ns, Inc. v. Cigar500.com, 2008 WL 2696168, at *5 (S.D.N.Y. July 7, 2008) (finding section 302(a)(1) jurisdiction over defendants because interactive website was primarily used to effect commercial transactions; even though website did not target New York market, 10% of website's revenue was derived from New York consumers).

Given the fact that the defamation claims arise solely from the posting of reports by members of the public on a mostly interactive website that does not itself engage in commercial activity, much less commercial activity targeting New York, plaintiff cannot sustain his burden to demonstrate that this claim arose from the transacting of business in New York by the defendants. See, e.g., Best Van Lines, 490 F.3d 250-51 (gathering cases); Knight-McConnell, 2005 WL 1398590, at *3; see also SPCA of Upstate N.Y., Inc., 18 N.Y.3d at 404-06, 940 N.Y.S.2d at 527-29.[14]

---

[14] Plaintiff cites one court decision that held that jurisdiction over Xcentric could be asserted here under section 302(a)(1). Intellect Art, 2009 WL 2915273, at *5-6. That conclusion has been rejected by another state court (see Order, Greenky v. Joslin, 101174/2010, Jan. 23, 2012, available at http://decisions.courts.state.ny.us/fcas/fcas_docs/2012JAN/300101 1742010003SCIV.pdf (court granted Xcentric's motion to dismiss for lack of jurisdiction under sections 301 and 302)), and in any event, given both the record before us and the demanding standard that a plaintiff must meet to pull an out-of-state defendant into a New York court based on allegedly defamatory statements posted by others on a website, plaintiff here plainly falls short. E.g., Best Van Lines, 490 F.3d 250-54.

2. <u>The Breach-of-Contract Claim</u>

In assessing potential grounds for asserting jurisdiction over plaintiff's contract claim, we are left, once again, with section 302(a)(1) as the only potential candidate. Sections 302(a)(2) and (3) apply only to tortious conduct, <u>see</u> <u>Florczak v. Staffieri</u>, 2006 WL 1085173, at *3 (N.D.N.Y. Apr. 25, 2006) (citing <u>Amigo Foods Corp. v. Marine Midland Bank-N.Y.</u>, 39 N.Y.2d 391, 396, 348 N.E.2d 581, 584 (1976)),[15] and 302(a)(4) is inapplicable, as we have noted, because defendants neither own nor use real property in New York. Section 302(a)(1) also does not save plaintiff's claim.

The Second Circuit has identified the following factors as relevant to whether a contracting party has "transacted business" in New York:

> whether the defendant has an ongoing
> contractual relationship with a New York

---

[15] As the New York courts have observed, "a breach of contract does not give rise to a tort action" without "a breach of duty separate and distinct from a breach of contract." <u>Skouras v. Brut Prods., Inc.</u>, 45 A.D.2d 646, 647, 360 N.Y.S.2d 811, 813 (1st Dep't 1974) (quotation omitted). No such conduct is alleged in the present case. (<u>See</u> Am. Compl. ¶¶ 52-55 (plaintiff's breach-of-contract claim)). Therefore, sections 302(a)(2) and (3) are inapplicable to plaintiff's breach-of-contract claim. <u>Accord</u> <u>Florczak</u>, 2006 WL 1085173, at *3 (citing <u>Amigo Foods Corp.</u>, 39 N.Y.2d at 396, 384 N.Y.S.2d at 584).

37

> entity, whether the contract was negotiated or
> executed in New York, whether the defendant
> visited New York in connection with the
> contract, and whether the contract is to be
> governed by New York law under a choice of law
> clause.

Berkshire Capital Grp., LLC v. Palmet Ventures, LLC, 307 F. App'x 479, 480 (2d Cir. 2008) (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22-23 (2d Cir. 2004) (quoting Agency Rent A Car Sys., Inc., 98 F.3d at 29)). While these factors are relevant, they are not exhaustive, and no single factor is dispositive. AIG Fin. Prods. Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash., 675 F. Supp.2d 354, 361 (S.D.N.Y. 2009) (citing Sunward Elecs., Inc., 362 F.3d at 23). The ultimate jurisdictional determination is based on the totality of circumstances. Id. (quoting Best Van Lines, Inc., 490 F.3d at 246).

"The Court of Appeals has made clear that given rapid advances in technology, physical presence in New York is not a prerequisite for jurisdiction so long as the defendant 'on his or her own initiative projects himself or herself into this state to engage in a sustained and substantial transaction of business.'" Berkshire Capital Grp., LLC, 307 F. App'x at 481 (quoting Fischbarg v. Doucet, 9 N.Y.3d 375, 382, 849 N.Y.S.2d 501, 507 (2007)). However, when a contract is to be performed entirely outside of New York,

38

the fact that the defendant engaged in some contact with a New York purchaser does not necessarily mean that the defendant transacted business in New York under section 302(a)(1). Id. "'[C]ourts seem generally loath to uphold jurisdiction under the 'transaction in New York' prong of CPLR 302 if the contract at issue was negotiated solely by mail, telephone, and fax without any New York presence by the defendant.'" Skrodzki, 810 F. Supp.2d at 512 (quoting Worldwide Futgol Assoc., Inc. v. Event Entm't, Inc., 983 F. Supp. 173, 177 (E.D.N.Y. 1997)). A defendant's communications into New York will suffice to establish specific jurisdiction only if they are related to a transaction that had its "center of gravity" inside New York, into which a defendant "projected himself." Maranga v. Vira, 386 F. Supp.2d 299, 306 (S.D.N.Y. 2005) (quoting Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 112 (S.D.N.Y. 1993)).[16]


Seldon contends that he and Magedson entered into at least one oral contract that they negotiated over the phone and, perhaps, email. (Am. Compl. ¶¶ 8, 53-54 (alleging that plaintiff and

---

[16] Even when a defendant has communicated "with plaintiff in New York by phone, fax and possibly mail . . . no court has extended § 302(a)(1) to reach a nondomiciliary who never entered New York, who was solicited outside of New York, who performed outside of New York such services as were performed, and who is alleged to have neglected to perform other services outside of New York." Skrodzki, 810 F. Supp.2d at 512 (emphasis added) (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriquez, 171 F.3d 779, 788-89 (2d Cir. 1999)).

defendants entered into an agreement to remove, or make unsearchable, the allegedly defamatory postings if they were unsubstantiated); Pl.'s Affirmation ¶ 8 (alleging that the parties made "two oral contracts . . . over the telephone" and that they subsequently had "further" telephone and email conversations)).[17] Under those contracts, Seldon asserts at one point, Magedson agreed unconditionally to remove the posts about Sheldon from the website's searchable content and to prohibit future posts about Seldon. (Am. Compl. ¶ 53). He also supposedly agreed to provide advertising on the site for companies affiliated with Seldon. (Id.). In exchange, Magedson allegedly was to receive "websites" that Seldon "was not using," the value of which Seldon claims was approximately $150,000.00. (Id.; Pl.'s Affirmation ¶ 9).[18] Plaintiff asserts that the term of the advertising contract was less than one year, although the parties had contemplated amending the contract to include a five-year advertising term. (Pl.'s Affirmation ¶ 9).[19]

---

[17] We infer that for all of the relevant correspondence, plaintiff was located in New York and defendants were located in Arizona.

[18] As previously noted, Seldon offers several inconsistent versions of what these oral contracts required of Magedson. (See Am. Compl. ¶¶ 8, 53; Pl.'s Affirmation ¶ 9). We assume, for our analysis, that plaintiff's broadest characterization of the agreements is correct.

[19] Plaintiff's original complaint alleged that the advertising term was for five years. (Compl. ¶ 52).

Based on these allegations, Seldon asserts that he and Magedson entered into an on-going contractual relationship. However, the totality of the circumstances suggests that exercise of long-arm jurisdiction under section 302(a)(1) would be improper because defendants did not "transact business" in New York. In this regard, a single agreement (or a single set of agreements) between a New York resident and someone outside of the state is, without more, insufficient to confer jurisdiction if the contract's "center of gravity" is not in New York. Cf. Kimco Exch. Place Corp. v. Thomas Benz, Inc., 34 A.D.3d 433, 434-35, 824 N.Y.S.2d 353, 354 (2d Dep't 2006) (marketing directed nationally, the sending of executed contracts to New York, and making "a few telephone calls" to New York insufficient to grant long-arm jurisdiction); Skrodzki, 810 F. Supp.2d at 513 (quoting DirecTV Latin Am., LLC v. Park 610, LLC, 691 F. Supp.2d 405, 420 (S.D.N.Y. 2010)) (finding no personal jurisdiction under section 302(a)(1) where defendant's contacts with New York consisted of telephone calls, fax transmissions, and other correspondence in connection with negotiating a contract that had its center of gravity well outside the state; the only relationship between New York and the transaction at issue was the plaintiff was a New York resident); Maranga, 386 F. Supp.2d at 306-08 (defendant did not transact business in New York under section 302(a)(1) even though he entered into an on-going contractual

41

relationship with plaintiff because contract was executed out of state, defendant never visited New York in connection with the contract, there was no New York choice-of-law clause in the contract, no payment entered New York under the contract, and only one party was located in New York during contract negotiations).

In this case, the contract(s) as alleged by Seldon were agreed to when Magedson was not in the state, and they called for changes to the defendants' website that would be performed in Arizona. Indeed, there is no suggestion that performance of any aspect of the agreements required activity in New York, and plaintiff does not refute Magedson's assertion that any agreed-upon services would have been performed by defendants in Arizona. (See Magedson Decl. ¶¶ 2, 9-10). As the courts have noted in the context of contract claims, "[i]n determining jurisdiction, the place of performance is more critical than the place of the execution of a contract." Cooper, Robertson & Partners, LLP v. Vail, 143 F. Supp.2d 367, 371 (S.D.N.Y. 2001). Moreover, Magedson did not visit New York to negotiate the terms of the alleged contract(s), and Seldon does not mention any choice-of-law provision or otherwise indicate that New York law governs the agreement(s). In this case, the totality of the circumstances militates against a finding that Magedson's alleged contract with plaintiff projected defendants into New York

in such a fashion as to trigger jurisdiction under section 302(a)(1).

Plaintiff's relies on <u>Intellect Art</u> to dispute this conclusion. We find his argument unpersuasive.

In <u>Intellect Art</u>, plaintiff sued Xcentric for defamation and product liability and sued a co-defendant who has posted on the ripoff website for defamation on breach of contract. 2009 WL 2915273, at *2. In pursing jurisdiction over Xcentric, plaintiff alleged that it profits by "soliciting business from the companies and individuals who have had negative posts made against them. For a fee, Xccentric [sic] offers to enroll companies and/or individuals in a program by which Xcentric will follow-up[] with the aggrieved individuals or entities" to resolve complaints posted on ripoffreport.com. <u>Id.</u> at *6. The court found that Xcentric had sufficiently "transacted business" in New York through its website to satisfy section 302(a)(1) because of "the high level of interactivity of the website, the undisputed fact that information is freely exchanged between website users . . . and Xcentric, Xcentric's alleged role in manipulating user's information and data, and Xcentric's solicitation of companies and individuals to 'resolve' the complaints levied against them on Ripoff Report." <u>Id.</u>

43

Notably, Intellect Art did not sue Xcentric for contract breach,
and the court therefore never addresses the possible basis for
asserting such a claim in New York against that defendant.[20] This
decision, which has been explicitly and persuasively rejected by
another New York court, see A-1 Tech. Inc. v. Magedson, Index No.
150033/10 (Sup. Ct. N.Y. Cnty. June 22, 2011) (available    at
https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?docu
mentId=bSxX92HGxtUbm1sDp0eFMA==&system=prod); see also Greenky v.
Joslin, Index No. 101174/2010 (Sup. Ct. N.Y. Cnty. Jan. 23,
2 0 1 2 ) ( d e c i s i o n    a v a i l a b l e    a t
http://decisions.courts.state.ny.us/fcas/fcas_docs/2012JAN/300101
1742010003SCIV.pdf), does not save plaintiff's contract claim
against defendants.

     In any event, the alleged efforts of Xcentric to capitalize
financially on negative postings on the website (through the
program referred to as CAP) does not provide jurisdiction here.
Although Magedson is alleged to have solicited CAP business from
the subjects of negative posts, Seldon does not expressly allege

---

[20] It bears noting that the co-defendant sought dismissal only of
the defamation claim, and never challenged the contract claim.
Intellect Art, 2009 WL 2915273, at *2. Accordingly, the court had
no occasion to address jurisdictional issues regarding any
contract claim.

that such solicitation occurs via the website.[21] Moreover, even assuming that it does (see IA Memo 10), Xcentric's possible nationwide solicitation of the subjects of negative posts for enrollment in CAP does not convert defendants' ownership of an otherwise non-commercial message board into a purposeful transaction of business in New York. See, e.g., Sayeedi v. Walser, 15 Misc.3d 621, 628, 835 N.Y.S.2d 840, 846 (Civ. Ct. Richmond Cnty. 2007) (no specific jurisdiction absent evidence that defendant purposefully invoked the benefits and protections of New York law, that defendant directed marketing at potential New York customers, or that defendant was soliciting New York residents in a manner different from its efforts vis-a-vis residents of any other state). Furthermore, plaintiff does not claim that any CAP-related fees -- or any funds for that matter -- are transmitted electronically via the website, or that website users can purchase or enroll in the CAP online. Even considering the website together with Seldon's alleged agreements with Magedson, Seldon has not made a prima facie showing that defendants transacted business in New York for purposes of section 302(a)(1). See Nationwide Mut. Ins. Co. v. Morning Sun Bus Co., 2011 WL 381612, at *8 (E.D.N.Y. Feb. 2, 2011) (no jurisdiction under section 302(a)(1); defendants did not

---

[21] In fact, with respect to Seldon, it appears that defendants' reputation-repair services were offered over the telephone and not through their website. (See Pl.'s Affirmation ¶ 8).

transact business in New York where website provided contact information for defendants' out-of-state sales representatives but New York customers could not purchase advertised goods through defendants' website); Arouh v. Budget Leasing, Inc., 63 A.D.3d 506, 506, 883 N.Y.S.2d 4, 5 (1st Dep't 2009) (negotiation of the purchase of an automobile via e-mail and telephone, which New York plaintiff initiated after viewing the car on defendant's web site, insufficient to constitute the transaction of business within New York under section 302(a)(1) because website, which described available cars and featured a link for e-mail contact but did not allow website customer to purchase a car, was not a projection of defendant into the state; in addition, car was to be picked up in Texas, so there was no contract to "supply goods or services in the state"); see also Skrodzki, 810 F. Supp.2d at 513 (quoting DirecTV Latin Am., LLC, 691 F. Supp.2d at 420).


    E. Conclusion


    Based on the foregoing, Seldon has not met his burden of demonstrating that jurisdiction over defendants is proper. Thus, we recommend that this case be dismissed for lack of personal jurisdiction. However, we will address the balance of defendants' dismissal motion for the benefit of the district court in the event

that it finds that the exercise of personal jurisdiction over
defendants is proper.


II. <u>The Communications Decency Act, 47 U.S.C. § 230 et seq.</u>


Defendants argue that Seldon's six defamation claims and part
of Seldon's contract claim are barred by the CDA's grant of
immunity to websites that publish defamatory third-party content.
(<u>See</u> Defs.' Mot. 8-14). Seldon asserts that CDA immunity is
unavailable for a number of reasons related to defendants' alleged
involvement in authoring and otherwise manipulating the offending
material -- because defendants author the "title tags" of user's
posts; because Xcentric "examines" every post and decides whether
to post it, and if so, whether to modify it; because Xcentric has
the ability to, and does, "monitor, read, and censor" the posts on
its website; and because Xcentric "edits and removes content for a
large fee" pursuant to the CAP. (Pl.'s Affirmation ¶ 7; Am. Compl.
¶¶ 6-7, 9).


The Communications Decency Act of 1996, 47 U.S.C. § 230, <u>et
seq.</u>, immunizes providers of "interactive computer services"
against liability arising from content created by third parties.
Section 230(c)(1) provides that "[n]o provider or user of an

interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(e)(3) preempts any state law that is inconsistent with the protections that section 230 offers. Thus, under section 230 internet service providers are shielded from liability arising from defamation and other state-law claims that are premised on posts of, or links to, third-party content. See Murawski v. Pataki, 514 F. Supp.2d 577, 591 (S.D.N.Y. 2007) (citing Gucci Am., Inc. v. Hall & Assocs., 135 F. Supp.2d 409, 417 (S.D.N.Y. 2001) (citing legislative history of the CDA)).

This grant of immunity applies only if the interactive computer service provider is not also an "information content provider" -- a person or entity who is "responsible, in whole or in part, for the creation or development of" the complained-of content. 47 U.S.C. § 230(f)(3); see also Ascentive, LLC v. Opinion Corp., --- F.Supp.2d ----, 2011 WL 6181452, at *16 (E.D.N.Y. Dec. 13, 2011). "Case law . . . suggests that one is responsible for the 'development' of information when he engages in an act beyond the normal functions of a publisher (such as deciding to publish, withdraw or modify third-party content) that changes the meaning and purpose of the content." Ascentive, LLC, 2011 WL 6181452, at *19 (emphasis added) (citing Fair Hous. Council of San Fernando

48

Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008)).

Nonetheless, courts have routinely held that section 230 immunity

should be broadly construed. See Atl. Recording Corp. v. Project

Playlist, Inc., 603 F. Supp.2d 690, 699-700 (S.D.N.Y. 2009)

(gathering cases).[22]

A website, such as ripoffreport.com, is considered to be an

"interactive computer service" that falls within the potential

scope of section 230 immunity. See Ascentive, LLC, 2011 WL 6181452,

at *18 (citing cases); Shiamili v. Real Estate Grp. of N.Y., Inc.,

17 N.Y.3d 281, 290, 952 N.E.2d 1011, 1018 (2011); see also Doe v.

City of N.Y., 583 F. Supp.2d 444, 449 (S.D.N.Y. 2008). In addition,

website operators such as Magedson are considered to be providers

of interactive computer services and thus may also be granted

section 230 immunity. See, e.g., Ascentive, LLC, 2011 WL 6181452,

at *18.

---

[22] Some courts engage in a three-part inquiry when determining
whether a party is entitled to CDA immunity: (1) whether
defendant is a provider of an interactive computer service; (2)
whether the postings at issue were provided by another
information content provider; and (3) whether plaintiff seeks to
treat defendants as a publisher or speaker of third-party
content. See Gibson v. Craigslist, Inc., 2009 WL 1704355, at *3
(S.D.N.Y. June 15, 2009) (quoting Nemet Chevrolet, Ltd. v.
Consumeraffairs.com, Inc., 564 F. Supp.2d 544, 548 (E.D. Va.
2008)).

A. <u>Defamation Claims</u>

In this case, it is undisputed that defendants did not create the content to which plaintiff objects -- the allegedly defamatory posts. Instead, as discussed above, those posts were written and submitted by one or more website users. (<u>See</u> Am. Compl. ¶ 8). In fact, Seldon does not allege that Magedson created or altered any of the allegedly defamatory posts other than by choosing their titles. (<u>Id.</u> ¶ 9). We therefore must determine whether that behavior amounts to the development of defamatory content such as to preclude CDA immunity for defendants.

The headings that defendants allegedly created for the offending posts did not alter the substance, meaning, or purpose of their underlying content. The first post was titled "Sexual Pervert," and it detailed how Seldon had allegedly kept "all kinds of perverted photos on his computer" and taken "nasty photos" of the complaining poster "when he got [her] drunk." (Am. Compl. ¶ 18). The second post had no title. (<u>Id.</u> ¶ 25). The third post was titled "Tax Free Money Income," which alone cannot be said to be a defamatory statement regarding Seldon. The accompanying post detailed Seldon's alleged tax fraud. (<u>Id.</u> ¶ 32). The fourth post was titled "Philip Seldon Vindictive Harassment," and it detailed

50

Seldon's alleged harassment of an individual based on his ex-
roommate's refusal to have sex with him. (Id. ¶ 39). Finally, the
last post was titled "Philip Seldon," which is not in and of itself
defamatory. (Id. ¶ 46).

Even if defendants did provide the above-mentioned titles for
the offensive posts, such behavior -- which did not alter the body
of the posts -- is fairly said to be an editorial function and
would not render defendants "information content providers" who
played a substantive role in creating or developing the offending
content. See Ascentive, LLC, 2011 WL 6181452, at *21 (quoting Zeran
v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997)) (CDA bars
lawsuits that attempt to hold internet service providers liable for
liable the "exercise of . . . publisher[s'] traditional editorial
functions -- such as deciding whether to publish, withdraw,
postpone or alter content"); Asia Econ. Inst. v. Xcentric Ventures
LLC, 2011 WL 2469822, at *5-7 (C.D. Cal. May, 4, 2011) (finding
that ripoffreport.com was not an "information content provider"
even though it aided users in creating titles to their online
posts); cf. Roommates.Com, LLC, 521 F.3d at 1169 (discussing
meaning of "development" under CDA section 230; court explains that
a "website operator who edits user-created content -- such as by
correcting spelling, removing obscenity or trimming for length --

retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality [but that] a website operator who edits in a manner that contributes to the alleged illegality -- such as by removing the word 'not' from a user's message reading '[Name] did not steal the artwork' in order to transform an innocent message into a libelous one -- is directly involved in the alleged illegality and thus not immune."); Shiamili v. Real Estate Grp. of N.Y., Inc., 17 N.Y.3d 281, 292, 929 N.Y.S.2d 19, 27 (2011) (defendant website operators who created heading for reposted content "appear[ed] to have been" "content providers" under CDA with respect to that aspect of the post).

Seldon also alleges that defendants decide whether to post user-submitted reviews and whether to modify them by redacting defamatory content. (See Pl.'s Affirmation ¶ 7; Am. Compl. ¶ 6). Even if Magedson exercised his discretion in choosing which posts to make available on the website and in editing posts for defamatory content, such decisions would properly be within his purview as a website publisher as long as he was not altering the underlying meaning or purpose of the posts' content. See, e.g., Ascentive, LLC, 2011 WL 6181452, at *21 (a website that alters the display of third-party postings does not develop content for

section 230 purposes); <u>Murawski</u>, 514 F. Supp.2d at 591 (quoting
<u>Zeran</u>, 129 F.3d at 330) (a lawsuit seeking to hold service provider
liable for deciding whether to publish or alter third-party content
is barred by the CDA). In any event, Seldon does not allege that
Magedson censored the posts that had been made about him --
instead, Seldon objects to Magedson's alleged failure to alter or
restrict access to the offending posts. (<u>See</u> Am. Compl. ¶ 8).


Based on the foregoing, CDA immunity applies to all of
plaintiff's defamation claims against defendants, and we therefore
recommend that those claims be dismissed. <u>See</u>, <u>e.g.</u>, <u>Ascentive,</u>
<u>LLC</u>, 2011 WL 6181452, at *19-21 (CDA immunity can apply even if
defendants encouraged negative postings and manipulated order and
availability of posts); <u>Asia Econ. Inst.</u>, 2011 WL 2469822, at *7.[23]


B. <u>The Contract Claim</u>


To the extent that plaintiff attempts to hold defendants
liable for their failure to perform under the alleged oral

---

[23] A number of other courts have also found that similar state-law
claims, including defamation claims, against Xcentric and
Magedson were barred by CDA section 230. <u>See</u>, <u>e.g.</u>, <u>Asia Econ.</u>
<u>Inst.</u>, 2011 WL 2469822, at *5-7 (citing, <u>inter</u> <u>alia</u>, <u>GW Equity,</u>
<u>LLC v. Xcentric Ventures, LLC,</u> 2009 WL 62173 (N.D. Tex. 2009);
<u>Intellect Art Multimedia, Inc. v. Milewski</u>, 2009 WL 2915273 (Sup.
Ct. N.Y. Cnty. Sept. 11, 2009)).

contracts by not blocking, screening, or otherwise restricting public access to the defamatory postings (see Am. Compl. ¶¶ 8, 53), that claim is also barred by CDA section 230. See, e.g., Gibson, 2009 WL 1704355, at *4 (citing cases). The decision whether to restrict or remove content falls squarely within a website operator's exercise of a publisher's traditional role and is therefore subject to the CDA's broad immunity, even where the website operator has otherwise agreed to restrict or remove content.[24] See, e.g., Murawski, 514 F. Supp.2d at 591 (citing, inter alia, Zeran, 129 F.3d at 330) (the CDA immunized website from liability for failing to remove defamatory third-party content even though website had allegedly agreed to do so); see also Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102-03 (9th Cir. 2009) (CDA barred negligent-undertaking claim against website that had allegedly agreed to remove defamatory content and failed to do so).[25]

---

[24] It is also for this reason that the CDA shields defendants from liability for "edit[ing] and remov[ing]" content for a fee under the CAP. (See Pl.'s Affirmation ¶ 7; Am. Compl. ¶ 7).

[25] CDA immunity applies even if, as alleged, Magedson "had knowledge that the defamatory material about [Seldon] on ripoffreport.com was false." (Am. Compl. ¶ 8); see Atl. Recording Corp., 603 F. Supp.2d at 700 (discussing broad scope of CDA immunity, court referenced First Circuit's decision in Universal Commc'ns Sys., Inc. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007); Lycos court held that website operator's awareness of defamatory posts was insufficient to overcome section 230 immunity); Global Royalties, Ltd. v. Xcentric Ventures, LLC, 544 F. Supp.2d 929 (D. Ariz. 2008) (website-operator liability based on notice of defamatory posting has been rejected under CDA).

Based on the foregoing, we recommend that the part of plaintiff's contract claim seeking relief for defendants' failure to remove or restrict access to the allegedly defamatory posts be dismissed as barred under CDA section 230.

III. <u>Plaintiff's Remaining Breach-of-Contract Claim</u>

Defendants argue that the remaining contract claim is either barred by New York's Statute of Frauds, General Obligations Law § 5-701, or should be dismissed under Rule 12(b)(1) for plaintiff's failure to establish subject-matter jurisdiction over that claim. Plaintiff asserts that the Statute of Frauds does not bar his claim.

The portion of plaintiff's contract claim that is not barred by the CDA alleges that defendants agreed to "provide advertising for various companies with which [plaintiff] was affiliated in exchange for websites that [he] was not using." It does not concern the removal of the allegedly defamatory posts. (Am. Compl. ¶ 53; <u>see also</u> Pl.'s Affirmation ¶ 8).[26]

---

[26] The full text of the breach-of-contract claim is as follows: "On August 24, 2011 the defendants entered into an agreement with Philip Seldon in which they agreed to make the aforecited postings in the First through Sixth Causes of Action unsearchable, to insure [sic] that any future postings about

Under New York law, the elements of a breach-of-contract claim "include the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." E.g., Harris v. Seward Park Hous. Corp., 79 A.D.3d 425, 426, 913 N.Y.S.2d 161, 162 (1st Dep't 2010). Although a plaintiff does not need to plead each element individually, "a claim that fails 'to allege facts sufficient to show that an enforceable contract existed' between the parties is subject to dismissal." Berman v. Sugo LLC, 580 F. Supp.2d 191, 202 (S.D.N.Y. 2008) (quoting Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., 2003 WL 23018888, at *4-5 (S.D.N.Y. Dec. 22, 2003)). Conclusory allegations that an agreement was breached cannot sustain a breach-of-contract claim. Id. (citing Posner v. Minn. Mining & Mfg. Co., 713 F. Supp. 562, 563-64 (E.D.N.Y. 1989); Window Headquarters, Inc. v. MAI Basic Four, Inc., 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993)).

In the present case, the amended complaint alleges that on August 24, 2011, Seldon and defendants entered into an agreement under which defendants agreed that they would make the allegedly

---

Philip Seldon would not be published on ripoffreport.com and in addition to provide advertising for various companies with which Philip Seldon was affiliated in exchange for websites that Philip Seldon was not using. Defendants have refused to honor said agreement and have breached said agreement." (Am. Compl. ¶¶ 53-54).

56

defamatory posts unsearchable and prohibit future postings about
him on ripoffreport.com. (Am. Compl. ¶ 53). We have already found
that part of Seldon's claim to be barred by the CDA. However,
defendants also allegedly agreed on that same date to provide
advertising on their website for various companies with which
Seldon was affiliated in exchange for the use of website domain
names that Seldon presumably owned but was not using. (Id.).
Plaintiff alleges that defendants failed to perform this aspect of
the agreement,[27] and requests specific performance of the entire
agreement. (Id. ¶¶ 54-55). In addition, plaintiff also specifies in
his affirmation both the value of the consideration exchanged --
$150,000.00 for both the website domains and the advertising -- and
the contract's duration -- less than one year. (See Pl.'s
Affirmation ¶ 8).[28]

_____

[27] Reading plaintiff's papers liberally, as we must, we infer that
he means to allege that he performed his obligation of providing
access to unused website domain names to defendants. Defendants
do not argue that Seldon's pleading is inadequate in this
respect.

[28] Because plaintiff is proceeding pro se, it is appropriate to
consider factual assertions proffered in his opposition papers in
addition to those in the complaint, at least to the extent that
the two are consistent. See, e.g., George v. Pathways to Housing,
Inc., 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012) (citing
Shipman v. N.Y. State Office of Persons with Dev. Disabilities,
2012 WL 897790, at *4 (S.D.N.Y. Mar. 13, 2012); Gill v. Mooney,
824 F.2d 192, 195 (2d Cir. 1987) (considering allegations
contained in pro se plaintiff's affidavit submitted in opposition
to motion to dismiss)).

Plaintiff's pleading and accompanying papers outline the essential terms of the contract, and thus state a plausible claim of contract breach. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (a complaint is subject to dismissal unless its factual allegations, if credited, make the claim "plausible"); see also, e.g., Oberstein v. SunPower Corp., 2010 WL 1705868, at *5-7 (E.D.N.Y. Apr. 28, 2010) (finding that pro se plaintiff's complaint survived Rule 12(b)(6) motion to dismiss where complaint described the alleged agreement, identified the essential duties due by each party and alleged that defendant failed to perform its obligations).[29]

Defendants' arguments for dismissal of the remaining version of the contract claim are unpersuasive. First, the Statute of Frauds does not bar plaintiff's contract claim at this stage. Under New York's Statute of Frauds, an oral agreement is void if, by its terms, it cannot be performed within one year of its making or

---

[29] Although defendants argue that plaintiff failed to state a claim of breach of contract (see Defs.' Mot. 2 (stating that "each of the[] causes of action [that are barred by the CDA] fail to state a claim upon which relief may be granted [so those] claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6)")), they do not elaborate on that ground for dismissal with respect to the portion of plaintiff's contract claim that the CDA does not bar. (See id. at 14-17 (arguing only that remaining part of contract claim should be dismissed under New York Statute of Frauds and Rule 12(b)(1)).

before the end of a lifetime. N.Y. Gen. Oblig. Law § 5-701(a)(1).[30]
An affirmative defense, such as the Statute of Frauds, may be
raised by a motion to dismiss under Rule 12(b)(6) without resort to
summary judgment proceedings only if the defense appears on the
face of the complaint. See, e.g., S.E.C. v. Gabelli, 653 F.3d 49,
60 (2d Cir. 2011) (citing Harris v. City of N.Y., 186 F.3d 243,
250 (2d Cir. 1999) (statute-of-limitations defense)); Intuition
Consol. Grp., Inc. v. Dick Davis Publ'g Co., 2004 WL 594651, at *1
n.2 (S.D.N.Y. Mar. 25, 2004); McCoy v. Goord, 255 F. Supp.2d 233,
249 (S.D.N.Y. 2003) (citing Pani v. Empire Blue Cross Blue Shield,
152 F.3d 67, 74-75 (2d Cir. 1998)); see also 5B Charles Alan
Wright, Arthur R. Miller, Federal Practice & Procedure § 1357 (3d
ed. 2004) ("[T]he complaint also is subject to dismissal under Rule
12(b)(6) when its allegations indicate the existence of an
affirmative defense that will bar the award of any remedy; but for
this to occur, the applicability of the defense has to be clearly
indicated and must appear on the face of the pleading to be used as
the basis for the motion."). There is no indication in the

---

[30] Defendants focus on the one-year provision in asserting that
dismissal is proper but also aver that the contract, as pled, has
no end date. Thus we read their papers as also invoking the
Statute of Frauds' lifetime provision. (See Defs.' Mot. 15-16
(stating that contract claim is barred by Statute of Frauds
because plaintiff did not "allege that the performance could be
completed within a year" but also noting that "the advertising .
. . seems to have no end according to the allegation.")).

complaint that the contract could not possibly be performed within a year (or within a lifetime, cf. Horowitz v. Santamaria, 287 A.D.2d 373, 373-74, 731 N.Y.S.2d 449, 450-51 (1st Dep't 2001)) -- in fact, plaintiff asserts in his affirmation that the duration of the contract was less than one year. See Chemtex, LLC v. St. Anthony Enters., Inc., 490 F. Supp.2d 536, 544 (S.D.N.Y. 2007) (citing, inter alia, Marini v. D'Apolito, 162 A.D.2d 391, 392-93, 557 N.Y.S.2d 45, 46 (1st Dep't 1990)). Thus, dismissal at this stage based on the Statute of Frauds would be inappropriate.

Defendants also argue that the contract claim should be dismissed pursuant to Rule 12(b)(1) because plaintiff does not meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a). Plaintiff asks for $150,000.00 in damages for defendants' alleged breach. While defendants argue that it is not reasonably probable that plaintiff's contract claim is worth in excess of $75,000.00 (see Defs.' Mot. 16-17), "we recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" Scherer v. Equitable Life Assur. Soc'y of the U.S., 347 F.3d 394, 397 (2d Cir. 2003) (quoting Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc., 166 F.3d 59, 63 (2d Cir. 1999)). "To demonstrate a filing in bad faith, '[i]t must appear to a legal certainty that the claim is

really for less than the jurisdictional amount to justify dismissal'" for lack of subject-matter jurisdiction. <u>See</u> <u>Wolde-Meskel</u>, 166 F.3d at 63 (alteration in original) (quoting <u>St.</u> <u>Paul Mercury Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 289 (1938)).

Although defendants argue that there is no logical justification for plaintiff's contract-damages request because they are not liable for any alleged failure to remove the offensive posts (<u>see</u> Defs.' Mot. 17), plaintiff could have been damaged by defendants' alleged failure to post Seldon's companies' advertisements on their website. (<u>See</u> Am. Compl. ¶¶ 53-54). Defendants have not met the "high bar" of successfully rebutting the presumption that plaintiff's demand is legitimate as they have not demonstrated "to a legal certainty" that the recoverable amount does not meet the jurisdictional minimum. <u>See</u> <u>Scherer</u>, 347 F.3d at 397.

Therefore, we recommend that the court deny defendants' motion to dismiss plaintiff's claim for breach of contract insofar as that claim is not barred by the CDA.

61

CONCLUSION

For the foregoing reasons, we recommend that defendants'
motion to dismiss for lack of personal jurisdiction be granted. If
the district court finds that the exercise of personal jurisdiction
over defendants is proper, we recommend that the court grant
defendants' motion to dismiss all six of plaintiff's defamation
claims and the part of his contract claim that is barred by the CDA
and deny defendants' motion to dismiss the remaining part of
plaintiff's contract claim, which concerns website advertising.

As for the nature of the recommended dismissal, we note that
"[i]t is the usual practice upon granting a motion to dismiss to
allow leave to replead." Manswell v. United States, 2010 WL
3219156, at *7 (S.D.N.Y. Aug. 12, 2010) (citing Cortec Indus., Inc.
v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)). Nonetheless,
in this case, Seldon amended his complaint after receipt of
defendants' motion to dismiss, and thus has been given the
opportunity to reshape his pleadings in an effort to meet
defendants' jurisdictional defense. Since his revised pleading,
accompanied by his evidentiary proffer, fails to justify the
exercise of jurisdiction by this court, there is no justification
to invite still another effort on his part. As for the alternative

62

ground for dismissal under the CDA, since the statute imposes immunity on the cited claims, dismissal with prejudice is mandated.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Paul A. Crotty, Room 735, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated: New York, New York
       July 9, 2012

                              RESPECTFULLY SUBMITTED,


                              _____
                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE

Copies of this Report & Recommendation are being mailed today to:

Mr. Philip Seldon
500 E 77th Street
New York, NY 10162

Maria Crimi Speth, Esq.
Jaburg &  Wilk, P.C.
3200 N. Central, Suite 2000
Phoenix, AZ 85012